Filed 4/3/25  P. v. Bargas CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, <br><br>     Plaintiff and Respondent, <br><br> v. <br><br> DEVEN BARGAS, <br><br>     Defendant and Appellant. | H050299 <br> (Santa Clara County <br>  Super. Ct. No. C1775953) |

Lucas Gutierrez died after being beaten and stabbed repeatedly by two men. Defendant Deven Bargas was charged by information with one count of murder (Pen. Code, § 187) and was convicted of first degree murder for Gutierrez's death.  He was sentenced to 25 years to life in prison.  Defendant argues on appeal that the trial court improperly admitted irrelevant and unduly prejudicial text messages and police body camera footage, and should have instructed the jury on offenses defendant argues are lesser included offenses of murder.  Finding no prejudicial error, we will affirm the judgment.

## I.  TRIAL COURT PROCEEDINGS

### A.  TRIAL EVIDENCE

#### 1.  Eyewitness Eve Wilson

Eve Wilson testified under a use immunity agreement.  Wilson met defendant in 2016 through a man she was dating at the time, and saw him frequently that year.

Defendant told Wilson he had robbed someone for Xanax in 2016 or the first half of 2017.

Wilson began dating Lucas Gutierrez in 2017. Gutierrez was a drug dealer who primarily sold marijuana and occasionally cocaine. One night in October 2017 while Wilson was with Gutierrez, defendant sent her a direct message on Instagram around 10:00. Defendant asked to buy "some weed and some cocaine." Wilson thought it was a strange request because defendant had never asked to buy drugs from her before and she was not a known drug dealer. Wilson agreed to act as an intermediary between defendant and Gutierrez, arranging for defendant to buy one ounce of marijuana and three grams of cocaine for a total of $540. Defendant asked to meet at a community center near Branham Lane in San Jose.

Gutierrez drove with Wilson to pick up cocaine and then to meet defendant at the community center where they arrived just after midnight. Wilson saw defendant and another person walk past Gutierrez's car without stopping. Defendant instructed her via direct message to " 'Go to the parking lot cause hella cops that pass by.' " They drove into the community center parking lot, which was "very dim and dark." Gutierrez was reluctant to meet there because it was "really dark."

Defendant got into the back seat of Gutierrez's car and asked to weigh the cocaine. Wilson never saw defendant produce any cash to pay for the drugs. Defendant weighed the cocaine and "said that his brother had to see it weighed out too." Gutierrez waved over the man defendant said was his brother (identified at trial as Fabian Rodriguez), whom Wilson had never met. Gutierrez and defendant got out of the car to meet.

Wilson could see Gutierrez leaning over weighing the drugs while defendant and Rodriguez stood next to him. Wilson remained in the front passenger seat of the car. She looked at her phone and then "heard some glass -- the sound of glass breaking." She got out of the car and saw Gutierrez bent over with defendant and Rodriguez punching him,

2

each using one fist in both overhand and "down-to-up" motions. She could not see whether defendant or Rodriguez was holding an object.

Wilson tried to pull the men off of Gutierrez. They backed off slightly when she screamed, " 'What are you doing?' Like, 'Get off of him. Get off of him.' " Wilson saw Gutierrez's shirt was ripped and he was bleeding badly, and she realized he had been stabbed. Gutierrez took a few steps, threw the bag of marijuana, and took a few more steps before collapsing in the street.

Defendant approached Gutierrez and started "kicking him as hard as he can right in the stomach." Wilson screamed and tried to pull defendant away. She estimated defendant kicked him more than 10 times in the abdomen. Rodriguez stood by the trunk while defendant kicked Gutierrez and eventually told defendant, " 'Let's go.' " Defendant tried to get into Gutierrez's car. Wilson blocked the door because her phone was in the car and she wanted to call an ambulance. Gutierrez stood up and took a few steps toward the car before collapsing again. After Wilson started screaming as loudly as she could, defendant and Rodriguez fled on foot. Wilson immediately called 911, which took about five minutes, and police arrived by the end of the call. A recording of the 911 call was admitted into evidence and played for the jury.

Wilson acknowledged during her trial testimony that she was not entirely truthful during her interviews with the police. She did not initially disclose that the drug deal included cocaine because she wanted to protect Gutierrez.

### 2. First Responder Body Camera Footage

A San Jose police officer testified that he was first to arrive at the scene following the 911 call. The officer had been dispatched at 12:24 a.m. A woman exhorted him to help her boyfriend. The officer saw a male lying on the ground next to a blue car, and two bystanders who had apparently stopped to try to help. Over defense objections based on relevance and undue prejudice, the jury was shown the officer's body worn camera

video of the response. The officer testified that he administered CPR because he could not feel a pulse and did not see Gutierrez breathing. Medics arrived shortly thereafter.

### 3. Cell Phone Evidence

A district attorney investigator testified as an expert in call detail record analysis and cell phone forensics. He reviewed cell phone records for phones associated with defendant and Rodriguez. Those phones exchanged 198 text messages and 106 phone calls between October 1 and October 18, 2017 (the day of the homicide). Both phones were near each other and near the crime scene between about 10:00 p.m. and after midnight on the night of the homicide.

The investigator testified about text messages sent between defendant's and Rodriguez's phones the night of the homicide, which were obtained from defendant's cell phone provider. (We quote the messages verbatim, including spelling.) Rodriguez's phone texted defendant's phone at 12:09 a.m., "Were u going" and "Do i walk up." Defendant's phone responded at 12:10, "Yeah when I tell you too but imma just take it and dip fuck the car." Defendant's phone texted at 12:13, "You go have tonbeat his ass." Between 12:13 and 12:14 a.m., Rodriguez's phone responded, "Why," defendant's phone instructed, "Take his keys," and Rodriguez's phone responded, "Whats happening."

The investigator also testified over defense objection about text messages sent from Rodriguez's phone to a contact saved in the phone under the name Lurch. The messages had been deleted from Rodriguez's phone but were "recovered by the forensic tool that did the extraction." Rodriguez's phone texted Lurch at 10:23 p.m. the night of the homicide, "Can I use the thang to rob sum lil white nigga ill shoot u bread." The investigator testified that he believed "thang" referred to a gun. Less than a minute later Rodriguez's phone texted, "Or ill just go wit a knife if its not koo." Comparing the cell phone company records against the data obtained from Rodriguez's phone, the investigator testified there were additional deleted messages to and from Lurch that could not be recovered from the phone.

4

The investigator testified about the location of defendant's and Rodriguez's phones after the homicide. The phones spent a few days between San Jose and Gilroy before heading south to the San Diego-Tijuana border on October 20. Data from the phones indicated they were in Mexico until October 27.

Internet search history taken from a phone defendant possessed when he was arrested included the following search terms: " 'Deven Bargas' "; " 'Delete Instagram' "; " 'San Jose stab' "; " 'Man dies being stabbed near San Jose school' "; " 'Accomplice to murder' "; and " 'How long can you go to jail for being an accomplice?' "

### 4. Defendant's Arrest and Forensic Evidence

Defendant and Rodriguez were arrested when they re-entered the United States from Mexico. Blood on Rodriguez's shoe matched Gutierrez's DNA. No blood was found on defendant's shoes.

Police retrieved a 14-inch kitchen knife in a storm drain near the crime scene. Blood found on the knife matched Gutierrez's DNA. Rodriguez's fingerprint was found on the knife.

### 5. Autopsy Evidence

The forensic pathologist who conducted Gutierrez's autopsy testified as an expert. Gutierrez's face had multiple blunt force injuries, abrasions, a contusion, and a laceration. There were also abrasions on both knees. Gutierrez had five sharp force injuries to his abdomen, varying from one-and-one-half inch to six or seven inches deep. All five of those wounds contributed to his death. The deepest one "potentially caused a more immediate death" because it went through a rib, a lung, and the heart. The doctor ruled the death a homicide from stab wounds to the torso. Autopsy photographs were admitted into evidence and shown to the jury during the pathologist's testimony.

### B. JURY INSTRUCTIONS AND VERDICT

The jury was instructed on three theories of murder: direct murder liability (CALCRIM Nos. 520 and 521); liability for murder as an aider and abettor (CALCRIM

Nos. 400 and 401); and felony murder based on the predicate offenses of robbery, attempted robbery, and attempted carjacking (CALCRIM No. 540B). The jury was not instructed on robbery, attempted robbery, or attempted carjacking as lesser included offenses of murder.

The jury deliberated for approximately five to six hours over the course of two days. The jury found defendant guilty of first degree murder. The trial court sentenced defendant to an indeterminate term of 25 years to life.

## II.    DISCUSSION

### A. RODRIGUEZ'S TEXT MESSAGES

The prosecution moved in limine to admit Rodriguez's text messages to a contact in Rodriguez's phone known as Lurch. The prosecutor argued defendant and Rodriguez were part of an uncharged conspiracy to commit robbery, and that the text messages were admissible as coconspirator statements. (Evid. Code, § 1223.) Defense counsel countered the text messages were irrelevant and unduly prejudicial hearsay. The trial court admitted the messages, reasoning that they were a "piece in a step in that puzzle of the conspiracy, are relevant, and survive any 352 analysis."

### 1.  The Messages Were Relevant to Prove a Conspiracy

Evidence is relevant if it has "any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.) We review a trial court's relevance determination for abuse of discretion. (*People v. Kipp* (2001) 26 Cal.4th 1100, 1123.)

The cell phone data showed defendant's and Rodriguez's phones were near the crime scene (and each other) around 10:00 p.m. on October 17. Defendant's first message to Wilson about buying drugs occurred just before 10:00 p.m. The challenged text messages to Lurch were sent from Rodriguez's phone at 10:23 p.m. The homicide occurred just after midnight that night.

6

Given the temporal proximity both to defendant's messages to Wilson about buying drugs and to the homicide, we see no error in finding that the messages to Lurch were relevant to whether defendant and Rodriguez conspired to commit robbery. Defendant contends "the plan to rob Gutierrez had not yet been put into place at the time the text messages were sent." Defendant argues there was "no evidence that Wilson and Gutierrez agreed to sell appellant drugs until well after the Lurch text messages had been sent." But the messages to Lurch occurred after defendant had already contacted Wilson about buying drugs. The messages to Lurch were therefore relevant to show that defendant's request to buy drugs was a pretense to facilitate a robbery. That the details of the drug purchase were still being worked out does not render the messages inadmissible to show that a conspiracy existed.

Defendant argues "any inference that Rodriguez's text messages to Lurch related to his conspiracy with [defendant] was based on pure speculation." But this is not a situation where messages were sent days before a crime. The text messages were sent to Lurch after defendant's messages to Wilson, and less than two hours before the homicide. Rodriguez's reference to a knife in one message to Lurch is also consistent with the use of a knife to kill Gutierrez.

Defendant argues the messages were not relevant because "Rodriguez expressly identified his intended target as a 'white' person, and Gutierrez is not white." But the messages were relevant to show Rodriguez and defendant conspired to commit robbery, regardless of the meaning of any ethnic reference. At most, this argument goes to the weight of the evidence and not to its admissibility. (*People v. Young* (2019) 7 Cal.5th 905, 927 (*Young*).)

### 2. The Messages Were Relevant to Defendant's Mental State

The prosecutor relied on the messages to Lurch to argue to the jury, "there's circumstantial evidence that, at a bare minimum, [defendant] knew about the attempt to get a gun and/or knife and knew of the existence of weapons." The prosecutor also

7

argued that the jury could reasonably conclude defendant knew Rodriguez possessed a knife because the kitchen knife was "not the type of knife you could just, you know, keep in your pocket."

The messages to Lurch were relevant to defendant's mental state and possible knowledge of weapons. The cell phone forensics expert testified that defendant's and Rodriguez's phones were together that night, and were "in and around the crime scene" between 10:13 and 10:19 p.m. The messages to Lurch were sent at 10:23 p.m. The phones' proximity to one another is circumstantial evidence supporting an inference that defendant was aware of Rodriguez's messages to Lurch, despite there being no direct evidence of defendant's awareness.

Defendant argues that using the messages to show defendant's knowledge of weapons was an improper use of the evidence. He argues the trial court "appeared to agree with defense counsel that Rodriguez's text messages to Lurch did not constitute evidence of *appellant's* knowledge and/or mental state." But the trial court's decision to admit the evidence did not limit its admissibility in that fashion. Defense counsel did not request a limiting instruction, nor did counsel object on that basis during the prosecutor's closing argument. Defendant has failed to demonstrate any improper use of the evidence.

### 3. No Abuse of Discretion Under Evidence Code Section 352

Trial courts have discretion to "exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.) We review the trial court's decision for abuse of discretion (*People v. Lamb* (2024) 16 Cal.5th 400, 424) and we see none here.

The evidence was relevant for the purposes we have discussed. Although defense counsel conceded at the beginning of trial that defendant and Rodriguez intended to steal drugs from Gutierrez, counsel argued "there will not be any evidence that indicates that

8

[defendant] had any knowledge that Mr. Rodriguez had a weapon." Given that the text messages were brief and not overly offensive, the trial court could reasonably conclude they were relevant and did not create a substantial danger of undue prejudice. Because we conclude the trial court did not err in admitting the text messages, defendant's argument that admission of the messages violated his federal constitutional right to due process fails.

## B. BODY WORN CAMERA FOOTAGE

"A trial court may admit photographs of victims even when the photographs are 'gruesome' if 'the charged offenses were gruesome' and the photographs '[do] no more than accurately portray the shocking nature of the crimes.' " (*People v. Morales* (2020) 10 Cal.5th 76, 104.) "[V]ictim photographs and other graphic items of evidence in murder cases always are disturbing." (*People v. Scheid* (1997) 16 Cal.4th 1, 19.) "The jury can, and must, be shielded from depictions that sensationalize an alleged crime, or are unnecessarily gruesome, but the jury cannot be shielded from an accurate depiction of the charged crimes that does not unnecessarily play upon the emotions of the jurors." (*People v. Ramirez* (2006) 39 Cal.4th 398, 454.) We review the admission of media showing a victim's injuries for abuse of discretion. (*People v. Crittenden* (1994) 9 Cal.4th 83, 133.)

Defense counsel objected to the body worn camera video evidence as irrelevant and unduly prejudicial. The prosecutor argued the video was relevant to show defendant knew Gutierrez had been stabbed before defendant kicked him repeatedly, based on Gutierrez's shirt being soaked in blood. The prosecutor also argued the video was relevant to show what the crime scene looked like in the minutes following the stabbing. And the prosecutor argued the video was relevant to Wilson's credibility, which was at issue because she initially lied to the police about details of the drug transaction. The prosecutor noted that the proposed video was only a portion of the full footage of over five minutes; defense counsel argued that, at most, the evidence should be limited to

9

"either screen shots, still shots or limiting the video" if the main purpose was to show the condition of Gutierrez's shirt. The court found the evidence relevant and not unduly prejudicial. The court "took under submission" defense counsel's request to further shorten the video, indicating it would "review it and perhaps just tag a point where that can be pared down." It is unclear whether the parties or court ever returned to the issue of further reducing the length of the video.

We have reviewed the version of the video in the exhibit that was played for the jury, which is three minutes long. It depicts the officer performing chest compressions on Gutierrez. Gutierrez is lying on the asphalt in a pool of blood next to a car. Gutierrez's shirt is blood-soaked. Wilson is nearby and is clearly distraught.

### 1. Relevance

The video was relevant for the two purposes identified by the prosecution. Defendant's mental state was an element the prosecution had to prove beyond a reasonable doubt. The prosecution had the burden to prove that defendant either intended to kill Gutierrez or acted with reckless indifference to Gutierrez's life. The bloody condition of Gutierrez's shirt in the moments following the stabbing was relevant to support the argument that defendant knew Gutierrez had been stabbed before he kicked him repeatedly. Defendant argues the video "did not accurately depict the amount of blood that [defendant] would have seen" because it was taken after defendant had fled, some minutes after the stabbing. That argument goes to the weight of the evidence rather than to its admissibility. (*Young*, *supra*, 7 Cal.5th at p. 927.) Defense counsel was free to make that point to the jury during closing argument. The trial court could also reasonably conclude that the video was relevant to Wilson's credibility. After she admitted initially lying to the police about the nature of the drug transaction that she helped arrange, the video's consistency with her description of the assault on Gutierrez was relevant to assessing the reliability of her testimony about those events.

10

## 2. Undue Prejudice

The prosecution's main stated purpose for the video was to show that Gutierrez's shirt was blood-soaked. Although relevant to defendant's mental state, that purpose could have been satisfied by one or more still images taken from the video. Instead, the jury saw three minutes of close-up footage of a police officer providing chest compressions to Gutierrez, who was both covered in blood and lying in a pool of his own blood. Jurors need not be shielded from accurate depictions of charged crimes, but we acknowledge that the body camera video may have been unnecessarily graphic and therefore unduly prejudicial. We conclude, however, that the video evidence was not so troubling as to violate defendant's federal constitutional right to a fair trial.

Even assuming an abuse of discretion in overruling the Evidence Code section 352 objection, we find any error harmless after considering whether it is reasonably probable that defendant would have obtained a more favorable result had the objection been sustained. (*People v. Watson* (1956) 46 Cal.2d 818, 836.) The case against defendant was strong: defendant set up the drug purchase and there was no doubt as to whether he was one of the assailants; he also directed Rodriguez via text message immediately before the crime to "beat his ass." As we have discussed regarding Rodriguez's text messages to Lurch, circumstantial evidence supported an inference that defendant knew Rodriguez was armed with a weapon when defendant directed him to beat Gutierrez. And Wilson testified that she could see Gutierrez was bleeding before defendant kicked him "as hard as he can right in the stomach" more than 10 times. Defendant has not demonstrated a reasonable probability of a more favorable result had the video evidence been excluded.

Defendant argues the jury "had reason to doubt" Wilson's testimony about the kicking because defendant's shoes did not have blood on them when he was arrested at the Mexico border. But the arrest occurred several days after the crime, providing ample time for him to change shoes. Neither the prosecution's use of the body camera evidence

11

during closing argument nor the mere fact of the jury deliberating for over five hours compels a different conclusion.

## C. JURY INSTRUCTIONS

A jury may convict a defendant of "any offense, the commission of which is necessarily included in that with which he is charged." (Pen. Code, § 1159.) Trial courts have a sua sponte duty to " 'instruct a criminal jury on any lesser offense "necessarily included" in the charged offense, if there is substantial evidence that only the lesser crime was committed.' " (*People v. Smith* (2013) 57 Cal.4th 232, 239.) " '[A] lesser offense is necessarily included in a greater offense if either the statutory elements of the greater offense, or the facts actually alleged in the accusatory pleading, include all the elements of the lesser offense, such that the greater cannot be committed without also committing the lesser.' " (*Id.* at p. 240.) As we will discuss, an opinion by a different panel of this court has also endorsed the possibility of considering the preliminary hearing testimony under certain circumstances when applying the accusatory pleading test (*People v. Ortega* (2015) 240 Cal.App.4th 956, 969 (*Ortega*)). But "[t]he evidence adduced at trial is not to be considered in determining whether one offense necessarily is included within another." (*People v. Cheaves* (2003) 113 Cal.App.4th 445, 454; accord, *People v. Burnell* (2005) 132 Cal.App.4th 938, 945 ["the pleadings test does not permit the use of events at trial to add to the language of the information"]; see also *Smith*, at p. 244 [accusatory pleading test "does not require or depend on an examination of the evidence adduced at trial"].)

The information charged defendant with one count of murder, alleging he "did unlawfully and with malice aforethought, kill Lucas Lorenzo Gutierrez." The prosecution argued at the preliminary hearing that defendant should be held to answer for murder on multiple theories: express malice "for stabbing someone with a knife"; liability as an aider and abettor if Rodriguez was the stabber; and felony murder based on robbery or attempted carjacking. The prosecution proceeded on those same theories at

trial, arguing to the jury that "[a]ll of these theories lead to guilt." The trial court declined defendant's request for jury instructions on robbery, attempted robbery, and attempted carjacking. We review the instructional decision de novo. (*Ortega*, at p. 965.)

Defendant does not argue that the statutory elements test makes robbery, attempted robbery, or attempted carjacking lesser included offenses of murder. Nor does he argue that those crimes are lesser included offenses under the established accusatory pleading test in which we look solely to the charging document. Defendant's sole argument is that those crimes are lesser included offenses of murder *here* because the "preliminary hearing showed appellant was charged with murder pursuant to the felony murder theory based on his commission of the specified underlying offenses." Defendant relies on *Ortega* to support that conclusion.

Ortega was charged with forcible sexual penetration (Pen. Code, § 289, subd. (a)(1)(A)) and the information did not specify whether Ortega used a body part or a foreign object in committing the crime. (*Ortega*, *supra*, 240 Cal.App.4th at p. 968.) He argued on appeal that the trial court should have instructed the jury about sexual battery (Pen. Code, § 243.4, subd. (a)) as a lesser included offense. (*Ortega,* at p. 967.) The *Ortega* court determined that sexual battery is not a lesser included offense under the statutory elements test because "the forcible sexual penetration statute encompasses different types of contact than the sexual battery statute," making it "possible to commit the greater without committing the lesser (e.g., where penetration is accomplished by means other than a part of the perpetrator's body.)." (*Ibid.*) But in applying the accusatory pleading test, the *Ortega* court considered the preliminary hearing evidence and determined that sexual battery was a lesser included offense of forcible sexual penetration under those particular circumstances because the preliminary hearing testimony "supported only one means by which [the] defendant committed sexual penetration: by inserting his fingers into Doe's vagina." (*Id.* at p. 969.)

13

The People argue *Ortega* is inconsistent with statements of the Supreme Court and later published decisions from other appellate districts. (Citing *People v. Montoya* (2004) 33 Cal.4th 1031, 1036; *People v. Alvarez* (2019) 32 Cal.App.5th 781, 788–790.) We acknowledge the opportunity to revisit *Ortega*, but there is no need to do so here because the pertinent background is so dissimilar. The preliminary hearing evidence in *Ortega* revealed that the defendant had been held to answer under a *single*, specific factual theory. In contrast here the prosecution proceeded on three distinct theories at the preliminary hearing. Because the predicate offenses are not necessarily included under all theories the prosecution pursued at the preliminary hearing, they are not lesser included offenses of the charged murder even under *Ortega's* reasoning. The trial court properly declined to instruct the jury on those predicates.

As there was no instructional error, defendant's federal constitutional due process argument fails. And as we have not identified multiple errors in this appeal, defendant's cumulative prejudice argument also fails.

### III.    DISPOSITION

The judgment is affirmed.

14

_____
Grover, Acting P. J.

**WE CONCUR:**


_____
Danner, J.



_____
Bromberg, J.



H050299
*People v. Bargas*